IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Gregory Owens, (R72372), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 19 C 8233 |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| Frank Lawrence, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Gregory Owens, a prisoner incarcerated at the Menard Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his 2008 murder conviction from the Circuit Court of Cook County. For the reasons explained below, the Court denies the petition on the merits and declines to issue a certificate of appealability.

**I.  Background[1]**

A Cook County jury convicted Petitioner of the February 3, 2005 shooting death of Oscar Kelsey in the Jeffrey Manor neighborhood on Chicago's Southside. *Illinois v. Owens*, No. 1-10-0061, 2011 WL 10068771, at *1-*2 (Ill. App. Ct. June 17,

---

[1] The Court draws the following factual history from the state court record [29] and the state appellate court opinions. State court factual findings, including facts set forth in state court opinions, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted). Petitioner has not made such a showing.

2011) ("*Direct Appeal*"). Petitioner conceded at trial that he shot the victim but argued the killing was justified under self-defense and defense of his dwelling. *Id.*

The murder occurred at Teresa Hudson's home. *Id*. at *1. Petitioner lived in Hudson's home along with Hudson's son (Myson Hudson), Petitioner's cousin (Kelsey Jones), and Charles Morris. *Id*. at *2. Jones, Myson Hudson, Morris, Petitioner, and the victim's girlfriend, Jamieique Yancey testified at trial.

The evidence at trial showed the victim, Jones, and a third man were gambling and drinking while playing pool and shooting dice in Teresa Hudson's basement on the evening of February 2, 2005. *Id*. at *1, *2. Yancey was also present. *Id*. at *1. The victim was intoxicated. *Id*. at *1, *4.

The gambling upset Teresa Hudson who went to the basement confronting the group, told them to stop gambling, and instructed the victim to leave her home. *Id*. at *2. The victim refused and a confrontation with Teresa Hudson ensued. *Id*. at *2, *4. Morris, who had been upstairs in the home, went to the basement after hearing arguing. *Id*. at *4. Per Morris, the victim pushed Teresa Hudson. *Id.* Teresa Hudson went to the first floor and the victim followed her. *Id.*

At this point, Teresa Hudson's son Myson came downstairs to investigate while Jones and Morris came from the basement to the first floor. *Id.* Myson saw the victim "poking and chopping" at his mother, while Morris similarly witnessed the victim push and shove Teresa Hudson. *Id.* The three men separated the victim

2

from Teresa Hudson. *Id*. Teresa Hudson called Petitioner asking him to come home. *Id*.

At this point, Petitioner was out of the home on his way to a separate party. *Id*. at *5. He had known the victim for two years and considered him a good friend. *Id*. Petitioner explained that he saw the victim with a gun "about every day" and explained that the victim carried a gun because he had been victimized in the neighborhood on multiple occasions. *Id*. Teresa Hudson called Petitioner and asked him to come back to the house to pick up the victim. *Id*.

Petitioner returned to Teresa Hudson's home accompanied by two of his friends. *Id*. His presence did not deescalate the situation as Petitioner and the victim began arguing and the victim reiterated that he did not want to leave the home. *Id*. at *2, *4, *5. At this point, Teresa Hudson retreated to a second-floor bedroom, but the victim followed her and Petitioner, Jones, and Myson followed after. *Id*. While on the second floor, the victim struck Teresa Hudson and tried to smash a television on her head, but Petitioner intervened to stop the victim. *Id*. Teresa Hudson also tried to defend herself from the victim with a screwdriver. *Id*. The victim responded by leaving the second floor and going to the living room on the first floor. *Id*.

Petitioner and the victim then got into a physical confrontation on the first floor before the victim's girlfriend was able to initially remove the victim from the home. *Id*. The victim broke glass in the front door as he left, and then quickly

3

returned. *Id*. At this point, Petitioner armed himself with a handgun. *Id*. The victim's girlfriend stated that the victim was not armed when he reentered the home. *Id*. at *2. Petitioner conceded that he did not see the victim holding a gun, but he said he saw the victim with his right hand in his pocket like it was wrapped around something, and that he saw the handle of an object that looked like a gun handle. *Id*. at *6.

Petitioner testified that at this point he told other occupants in the house to "get [to the victim], before he hurts somebody." *Id*. Jones testified that several individuals, including Petitioner's friends, stepped in front of the victim pushing him against a wall separating him from Petitioner. *Id*. at *3. According to Jones, Petitioner told his friends to not let the victim get to him, but he denied providing a written statement to the police that Petitioner said he was going to kill the victim. *Id*. According to Jones's written statement, however, Petitioner said at that juncture, "y'all better get him," and "I'm going to kill him." *Id*. at *4.

Jones testified that the victim broke free from Petitioner's friends and started walking towards Petitioner. *Id*. at *3. Petitioner shot the victim multiple times. *Id*. Jones acknowledged that in his written statement, he stated that Petitioner walked up to the victim and fired three or four shots. *Id*. His statement also explained that the victim was facing away from Petitioner when he shot him. *Id*. Finally, the victim fled once Petitioner started shooting and Petitioner chased after him firing more shots. *Id*.

4

Myson Hudson also witnessed Petitioner shoot the victim. *Id*. at *4. He too saw the victim with his hands in his pockets prior to the shooting "like he [was] gonna do something." *Id*. Myson acknowledged at trial that he told detectives he saw Petitioner place the gun barrel against the victim's head when he shot him. *Id*. He also stated that he heard Petitioner say, "I'm sick of him," after the shooting. *Id*.

Petitioner explained that he discharged the first shot at the victim when he saw the victim pull his hands out of his pockets. *Id*. at *6. After the first shot, the victim rushed at him reaching for the gun, and Petitioner fired additional shots during the struggle. *Id*. Petitioner conceded on cross-examination that the victim fell after the first two shots and started crawling towards the front door. *Id*. He did not know how many times he shot the victim or if the victim remained standing after the first two shots. *Id*.

The medical examiner who performed the autopsy on the victim provided expert testimony at trial. *Id*. at *5. The expert explained that the victim suffered two gunshot wounds to his back, four to his abdomen, and one to his neck. *Id*. One of the gunshot wounds to the abdomen was consistent with the victim being shot while he was on the ground and the shooter was standing over him at his feet. *Id*. The gunshot wound to his neck showed signs of "searing," suggesting the gun was about an inch from the victim when it was fired. *Id*.

The court instructed the jury on first degree murder, an enhancement for Petitioner personally discharging the firearm that caused the victim's death, and

5

affirmative defenses of self-defense and defense of dwelling. [29-22] at 4–6, 113–14. The defense did not ask the court to instruct the jury on second-degree murder.

Self-defense and defense of one's dwelling require, among other things, that Petitioner had a reasonable belief in the need to use force. *Illinois v. Jeffries*, 646 N.E.2d 587, 597 (Ill. 1995); *Illinois v. Lee*, 2022 IL App (1st) 1711621, at ¶¶ 34, 47. Second degree murder occurs when the defendant had a subjective belief he was acting in self-defense, but that belief was objectively unreasonable. *Illinois v. Russell*, 2022 IL App (2d) 200119-U, at ¶ 47.

Prior to the case going to the jury, the trial court confirmed with Petitioner that he was choosing an "all or nothing" approach of a first-degree murder charge and associated affirmative defenses, and that he was forgoing a "middle ground" instruction of second degree murder in addition to first degree murder. [29-22] at 5–6. The jury subsequently found Petitioner guilty of first-degree murder and found that he personally discharged the firearm causing the victim's death. *Direct Appeal*, No. 1-10-0061, 2011 WL 10068771, at *7. The trial court sentenced Petitioner to 45 years of imprisonment for the murder, with 25 years (to run consecutively) for personally discharging the firearm, for a total sentence of 70 years. *Id*.

The state appellate court affirmed Petitioner's conviction on direct appeal but vacated and remanded the matter for resentencing. *Id*. at *15. The Illinois Supreme Court denied his petition for leave to appeal (PLA) on direct appeal, [29-6]. *Illinois v. Owens*, No. 112964, 962 N.E.2d 487 (Ill. Nov. 30, 2011) (Table). On

6

remand, the trial court reduced the murder sentence to 25 years but kept the 25-year sentence for personally discharging the weapon, resulting in a 50-year sentence. *Illinois v. Owens*, 2015 IL App (1st) 132667-U, ¶ 8. The appellate court affirmed the sentence on appeal. *Id.* at ¶ 20.

Petitioner then brought a postconviction petition pursuant to Illinois' Post Conviction Hearing Act, 725 ILCS 5/122-1. *Illinois v. Owens*, 2019 IL App (1st), 161537-U, at ¶ 27 ("*Post Conviction Appeal*"). The trial court denied the petition, the appellate court affirmed, *id.* at ¶¶ 27, 61, and the Illinois Supreme Court denied Petitioner's postconviction PLA, [29-7]. *Illinois v. Owens*, No. 125127, 132 N.E.3d 296 (Ill. Sept. 25, 2019). Having completed his state court proceedings, Petitioner now brings the instant habeas corpus petition [1] before this Court.

## II. Analysis

### A. Petitioner's Claims

Petitioner raises four claims in his habeas corpus petition [1], all relating to the performance of the various attorneys who assisted him in state court. Initially, he claims his trial attorney was ineffective in two ways. First, he claims counsel misinterpreted 725 ILCS 115-10.1, which governs the admissibility of prior inconsistent statements, and this misinterpretation, in turn, led to counsel failing to seek a second-degree murder instruction, when he otherwise should have done so, [1] at 5; he also claims counsel provided ineffective assistance regarding his advice on possible sentences: in particular, trial counsel told him he faced a minimum 20-year

7

sentence for first-degree murder, but did not explain that he also faced a 25-year additional sentence for personally discharging a weapon, which led him to reject the second-degree murder instruction. *Id.*

For his third claim, Petitioner alleges that his appellate attorney provided ineffective assistance by failing to raise the ineffective assistance of trial counsel discussed above. *Id.* at 6. Finally, he argues that his postconviction attorney provided ineffective assistance by failing to challenge the trial court's denial of his ineffective assistance of trial counsel claim in his postconviction proceeding. *Id.*

### B. Claims One and Three

As Respondent correctly notes, Claim One (alleging ineffective assistance of trial counsel for misinterpreting 725 ILCS 115-10.1 and failing to seek a second-degree murder instruction) and Claim Three (alleging ineffective assistance of appellate counsel for failing to raise Claim One on direct appeal) are procedurally defaulted. To preserve a claim for federal habeas corpus review, a prisoner must fairly present the claim through one complete round of state court review, including via a PLA before the Illinois Supreme Court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-46 (1999); *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018).

Petitioner did not raise these claims on direct appeal. [29-6], [29-9], [29-11]. Petitioner raised the claims in his postconviction petition before the state trial court, [29-8], but did not raise them in his postconviction appeal, [29-14], or his PLA, [29-7]. As a result of his failure to properly preserve the claims before the state court,

8

the claims are procedurally defaulted here. *Boerckel*, 526 U.S. at 845–46.

Petitioner did properly preserve Claim Two, alleging ineffective assistance of trial counsel for failing to properly explain the potential sentences faced by Petitioner, before the state court. But that cannot save the other claims. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel to preserve each respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). A "bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default"; rather, Petitioner must identify "the specific acts or omissions of counsel" that form the basis of his ineffective assistance claim. *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). Petitioner may not argue one theory of ineffective assistance of counsel to the state courts and another theory, based upon different facts, to the federal court. *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). Consequently, exhaustion as to Claim Two has no impact on Claims One and Three.

Petitioner cannot excuse the default through either cause and prejudice or fundamental miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013)

9

(quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).

An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts, and Petitioner did not do that. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Additionally, alleged ineffective assistance of postconviction appellate counsel does not qualify as cause to excuse a procedural default. *Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017). Finally, Petitioner's postconviction PLA, that he filed *pro se*, also did not include these claims; ultimately Petitioner bears responsibility for his default.

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's default. To show actual innocence to overcome a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggin*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial — such as exculpatory scientific

10

evidence, trustworthy eyewitness accounts, or critical physical evidence — to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483–84 (7th Cir. 2013) ("Adequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'") (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)).

Although Petitioner can argue actual innocence predicated upon an affirmative defense, *see Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999) (explaining that affirmative defense can be grounds for actual innocence because a jury acquitting based on the affirmative defense means the defendant was actually innocent); *Guy v. Butler*, No. 14 C 8581, 2015 WL 6165147, at *7 (N.D. Ill. Oct. 19, 2015) (considering actual innocence claim predicated on self-defense), he cannot meet the demanding actual innocence standard in this case. The evidence adduced at trial, including autopsy evidence, showed that Petitioner shot the victim in the back twice and shot him at least once in the abdomen while the victim was on the ground and Petition was standing over him. The evidence also showed that Petitioner threatened to kill the victim before the final confrontation and expressed disdain for the victim after killing him. This evidence undermines any claim that Petitioner was acting in self-defense or in defense of his home. In short, Petitioner cannot excuse the default of Claims One and Three and the Court thus denies them as procedurally defaulted.

11

### C. Claim Two

Petitioner alleges in Claim Two that his lawyer was ineffective for giving him inaccurate information regarding his likely sentence if convicted. Petitioner claims his attorney told him that if the jury convicted him of first-degree murder, then he likely faced a 20-year sentence. Based upon this advice, Petitioner elected to forgo a second-degree murder instruction. He argues that his lawyer's advice was ineffective because it failed to inform him that he also faced a mandatory 25-year enhancement if the jury found him personally responsible for discharging the firearm that killed the victim. Petitioner argues that his attorney should have told him that he actually faced a minimum of 45 years: the 20-year minimum sentence, plus the 25-year enhancement.

In considering this claim, the Court focuses upon the state appellate court's decision on postconviction review, the last state court decision to resolve Petitioner's claim on the merits. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). This "standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419

12

(2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard" demands that state-court decisions "be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

An ineffective assistance of counsel argument is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). Review under *Strickland* is deferential and applying *Strickland* under the AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123. The state appellate court properly identified the controlling *Strickland* standard. *Post-Conviction Appeal*, 2019 IL App (1st) 161537-U, ¶ 32.

The state court explained that Petitioner could not demonstrate prejudice because he had no right to participate in the choice on whether to bring a second-degree murder instruction. *Post-Conviction Appeal*, 2019 IL App (1st) 161537-U, ¶ 37 (finding that "petitioner did not forego a second-degree murder instruction as it was not his decision to make and trial counsel did not provide ineffective assistance in advising petitioner, whatever that advice may have been, on the sentencing range."). The state appellate court reached this conclusion based upon an intervening change in Illinois law.

13

Certain choices in a criminal trial can only be made by the defendant, while others are allocated to trial counsel as a matter of strategy. Trial management is the "lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)). Some decisions, however, are "reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, 138 S. Ct. at 1508 (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).

The Supreme Court has not spoken to whether choosing between an "all or nothing" strategy of instructing the jury only on a first-degree murder charge and associated affirmative defenses, or instead providing a "middle ground" of an additional second-degree murder charge, is a decision reserved for a defendant or a matter of trial strategy for counsel, and courts are split on the question. *See* 3 LaFave, *et al.*, *Criminal Procedure* § 11.6(a) § 11.6(a) n.55 (4th ed. 2021). At the time of Petitioner's trial, Illinois law instructed that the decision belonged to the defendant. *Illinois v. DuPree*, 922 N.E.2d 503, 734–35 (Ill. App. Ct. 2010); *Illinois v. Campbell*, 773 N.E.218, 222 (Ill. App. Ct. 2002) (citing *Illinois v. Gilmore*, 707 N.E.1236 (Ill. 1999)). Several years after Petitioner's trial, the law in Illinois changed, however, and Illinois now instructs that the decision constitutes a matter of trial strategy for counsel to resolve. *Illinois v. Zareski*, 2017 IL App (1st) 150836-U,

14

¶¶ 77, 78.² Based upon this change in the law, the state court rejected Petitioner's the corresponding ineffective assistance of counsel claim. *Post-Conviction Appeal*, 2019 IL App (1st) 161537-U, ¶ 37.

In denying Petitioner's claim, the state court faithfully applied *Lockhart v. Fretwell*, 506 U.S. 364 (1993).³ *Lockhart* held that a prisoner could not demonstrate *Strickland* prejudice when his attorney failed to object to the use of a sentencing factor that had erroneously been found to be impermissible, but later found to be permissible in case law correcting the error. *Lafler v. Cooper*, 566 U.S. 156, 167 (2012) (citing *Lockhard*, 506 U.S. at 373). Importantly, "when evaluating prejudice, unlike when evaluation of attorney performance, hindsight is permissible" so the Court may consider intervening changes in the law. *Shaw v. Wilson*, 721 F.3d 908, 918 (7th Cir. 2013) (citing *Lockhart*, 506 U.S. at 372). The intervening change in the law results in the prisoner being unable to demonstrate prejudice in his ineffective assistance of counsel claim because, as a matter of law, he had no right to the application of a legal rule that turned out to be incorrect. *Lafler*, 566 U.S. at 167; *Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006) ("*Lockhart* . . . applies in

---

2 The Seventh Circuit instructs that this decision constitutes strategy reserved for trial counsel. *Mitchell v. Enloe*, 817 F.3d 532, 538 (7th Cir. 2016) (citing *United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987)) (in case raising ineffective assistance of counsel claim challenging trial counsel's failure to request a second-degree murder instruction in a habeas corpus case arising from Illinois, "[o]ur case law establishes that where evidence at trial supports a lesser jury instruction, trial counsel may make a strategic decision not to request such instruction.").

3 Although the state court did not cite *Lockhart*, its ruling is consistent with that decision. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (explaining that all that is required is that a state court's reasoning be consistent with controlling Supreme Court case law, but the state court is not required to cite to, or even be aware of, the precedent).

15

cases where the defendant challenges his conviction based upon unusual circumstances that, as a matter of law, do not typically inform the court's inquiry. For example, such unusual circumstance could occur when a state court relies on overruled law . . ."). The prisoner has no right to a "windfall as the result of the application of an incorrect legal standard . . . ." *Lafler*, 566 U.S. at 167.

*Lockhart* remains dispositive here. As the state appellate court explained when denying the postconviction petition, with the intervening change in the law, Petitioner had no right to decide personally whether to bring a second-degree murder instruction. As a result, he had no right to challenge the validity of counsel's advice on this decision. Any alleged inaccurate information provided by counsel is irrelevant because Petitioner had no right to make that decision or receive advice on that decision in the first place. The state court correctly rejected the claim, and Petitioner thus cannot meet AEDPA's demanding standard. The Court denies Claim Two.[4]

---

4 Notably, after rejecting Petitioner's *Strickland* claim on this basis, the state court transformed Petitioner's claim into one challenging his counsel's decision to not seek the second-degree murder instruction. *Post-Conviction Appeal*, 2019 IL App (1st) 161537-U, ¶ 39. The Court questions that decision as Petitioner did not raise that claim before the state appellate court, [29-14] at 20–27; nor does he raise this claim here. Additionally, as explained, at trial Plaintiff, not counsel, elected to forgo the second-degree murder instruction. [29-22] at 4–6. And, finally, hindsight is not allowed when evaluating counsel's performance under *Strickland*. *Shaw*, 721 F.3d at 918. The important point for present purposes, however, is that the state court reached the correct result on this claim. *See, e.g., Rhodes v. Dittmann*, 783 F.3d 669, 675 (7th Cir. 2015) ("Section 2254(d) focuses on the ultimate decision of the state court, not on parts of a written opinion that might in isolation appear to be misguided but that in the end are not necessary to the outcome. As we often have noted, we review judgments, not opinions.") (citations omitted).

### D. Claim Four

Petitioner's final claim alleges ineffective assistance of postconviction appellate counsel for failing to raise certain issues in his postconviction appeal. No constitutional right to effective assistance of counsel in a postconviction appeal exists, however, and so this claim is not cognizable. 28 U.S.C. § 2254(i); *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Parker v. Nicholson*, No. 09 C 7947, 2018 WL 3158501, at *6 n.2 (N.D. Ill. June 27, 2018). The Court rejects Claim Four and denies Petitioner's habeas corpus petition.

### III. Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court advises Petitioner that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. But if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion

17

must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**IV. Conclusion**

The Court denies Petitioner's habeas corpus petition [1] and declines to issue a certificate of appealability. The Court instructs the Clerk to: (1) terminate Respondent Frank Lawrence from the docket; (2) add Petitioner's current custodian, Anthony Wills, Warden, Menard Correctional Center, as Respondent; (3) alter the case caption to *Owens v. Wills*; and (4) enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

Dated: February 17, 2023      ENTERED:

John Robert Blakey
United States District Judge